UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | *Criminal No. 06-94-P-S* |
| | ) | |
| DAVID JACKSON, | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

David Jackson, charged with possession of two firearms by a felon in violation of 18 U.S.C. § 922(g)(1) and 924(e), Indictment (Docket No. 1), moves to suppress evidence obtained and statements made on July 13, 2004, the day he was arrested on this charge. An evidentiary hearing was held before me on April 17 and 26, 2007 at which the defendant appeared with counsel. I now recommend that the following findings of fact be adopted and that the motion be granted in limited part.

**I. Proposed Findings of Fact**

On July 13, 2004 Michael Lacombe, a Lewiston, Maine police officer, responded to a call from Mark Hoener at 188 Russell Street in Lewiston who reported that an RG twenty-two caliber pistol had recently been stolen from that address. Hoener blamed his stepson, Tyler Mancuso. Trevor Campbell, now a detective with the Lewiston Police Department and then a member of the Central Maine Violent Crimes Task Force and cross-deputized as a United States Marshal, joined Lacombe in response to his request for assistance. Campbell spoke to Mancuso, who reported that he had traded the gun for $100 worth of crack cocaine from a black male known as "Scooby" who was wearing dreadlocks and a black do-rag, an orange shirt and gold chains. Campbell knew that a black man known as Scooby was David Jackson, the defendant in this case, because he had dealt with him

1

previously several times. He knew of no other person called Scooby in the Lewiston-Auburn area and the description given by Mancuso matched the defendant.

Campbell ran a criminal history check on the defendant and called to confirm that he was on probation. He spoke with the defendant's probation officer, Pauline Gudas, who related that permission to search his residence was a condition of the defendant's probation. She knew that the defendant was residing at the 209 Ash Street apartment of Pamela Belanger and that he was on probation after a robbery conviction. Campbell learned that the defendant had enough qualifying convictions to make his possession of the firearm a federal case. Lacombe, Gudas, Campbell, Deputy United States Marshal Christopher Clifford (Campbell's partner) ("Clifford"), officers Wayne Clifford, Michael Lacombe, Jane Huffman and Robert Ullrich, and perhaps another Lewiston police officer, then went to 209 Ash Street. All but Campbell, Gudas and Clifford were in uniform. Campbell told the other officers that the defendant might be armed and dangerous; they did not talk about the possibility that this might be a federal case.

Defendant's Exhibit B is a photograph of the landing and staircase leading to the third floor hallway at 209 Ash Street. Defendant's Exhibit C is a photograph of the top of that hallway just to the left of the Belanger apartment. Defendant's Exhibit D is a photograph of the door to the apartment. Defendant's Exhibit E is a photograph of the same door and a portion of the hallway to the right of the door. Defendant's Exhibit F is a photograph of the continuation of the hallway to its end. Defendant's Exhibit G is another photograph depicting the end of the hallway and the lack of an exit past the door to the Belanger apartment. Defendant's Exhibit O is a video on CD of the areas shown in Defendant's Exhibits B-G. Defendant's Exhibit A is a floor plan of the Belanger apartment.

Upon arriving at the third floor of 209 Ash Street, Campbell knocked on the door of the Belanger apartment. Gudas was with him and the other officers were behind them on the landing at the

top of the staircase and on the staircase itself. Belanger answered the door and Campbell saw the defendant standing behind her wearing clothing that matched the description given by Mancuso. He asked the defendant to step out into the hallway, and the defendant complied. The defendant stood where a child seat is depicted in Defendant's Exhibit F, with Campbell next to him nearer the apartment door and Gudas behind him.

The defendant agreed to allow Campbell to pat him down. Campbell did so and found a folding knife in the defendant's left pocket. Campbell told the defendant that he was investigating a complaint of a stolen firearm and asked if the defendant was involved. Campbell described what he knew about the gun, including what Mancuso had said. The defendant said that he knew where the gun was and if Campbell gave him one or two hours he might be able to get it. Campbell's immediate reaction was that that was not going to happen because the defendant was a felon involved with a firearm and Campbell was not going to let him retrieve the gun by himself. He specifically told the defendant, "You cannot go alone." The defendant did not offer to take any of the officers to get the gun.

In part to give the defendant time to think about possibly cooperating with the investigation, Campbell then went into the apartment with Gudas,[1] leaving the defendant in the hallway. Campbell asked Belanger if they could search the apartment and she gave oral and written permission for the search. Government Exhibit 1 is the written permission form; it is also Defendant's Exhibit P. Campbell then went back into the hallway and advised the defendant that he had consent to search the apartment. He did not direct any questions to the defendant. The defendant then volunteered that he had lied and that the guns were inside a cereal box in the apartment's refrigerator.

---

[1] Gudas testified that she went into the apartment by herself before Campbell patted the defendant down. This difference in the testimony has no effect on my recommended decision.

3

Campbell went to the refrigerator and found a Fruity Pebbles box on the bottom shelf which contained two firearms wrapped in plastic with ammunition for each. One of the guns was the one that had been stolen from Hoener. Gudas believes that other rooms of the apartment were searched before the guns were found. The defendant was then arrested for violation of his probation based on his possession of stolen firearms. At some point he was taken into the living room of the apartment, where Gudas spoke with him. She explained why she was there and talked about an earlier motion to revoke his probation that she had filed due to an arrest for operating under the influence of drugs or alcohol. The defendant was quiet and did not appear to be agitated, afraid or upset. Gudas asked the defendant why he needed a firearm, and he replied that he needed it for protection. Gudas then went into the apartment's kitchen. Defendant's Exhibit L is Gudas's notes from this incident. The defendant was taken to the Lewiston Police Department by an officer in a marked cruiser.

In an interview room at the Lewiston Police Department that was from seven feet by seven feet to ten by twelve feet in size, Campbell read the defendant his *Miranda* rights. Government Exhibit 2 is the form signed by the defendant, waiving those rights; the same document is also Defendant's Exhibit I. Campbell then asked the defendant specific questions about the stolen gun. The defendant identified a third person who had facilitated the deal, stated that the gun was exchanged for money, not crack cocaine, and stated that he wanted the gun because he had heard on the street that he was being threatened. He stated that he had the second gun for a collection and that he did not know the guns were stolen.

The following stipulations were entered into evidence as Defendant's Exhibit V: Lewiston police officer Wayne Clifford was on duty on July 13, 2004; he went to 209 Ash Street that day in support of other officers; he remembers only being at the top of the stairs; and he no longer recalls any actions or conversations that may have occurred at the time.

Before Christopher Clifford went to 209 Ash Street on July 13, 2004 he had never met the defendant or been to that address. He did not speak with the defendant himself that day. He was present while Campbell described for the defendant the evidence he had about the stolen firearm. He does not recall Campbell or any other officer telling the defendant what penalties the defendant faced in federal court or that he might be an armed career criminal. Clifford testified at the hearing that he does not believe that he made a telephone call that day from 209 Ash Street, but that, if he did, he did not pull out his cell phone in front of the defendant. He made clear that if he wanted to speak to the prosecutor he would not have done that in front of the defendant because he would not have wanted the defendant to hear what he was saying; he would have gone to an outside landing to make such a call. He denied threatening to call the United States Attorney's office in front of the defendant. He did go into the apartment when the defendant did, after the defendant was handcuffed, but he did not participate in the search. He did not know at the time whether the defendant qualified as an armed career criminal. He heard Campbell say that he had consent to search the apartment when he came out of the apartment. He was in the interview room at the Lewiston Police Department with Campbell and the defendant and witnessed the defendant being asked to sign the *Miranda* waiver form before he was asked any questions whatsoever.[2]

---

[2] Clifford testified as a rebuttal witness. I credit all of Clifford's testimony. Thus, where his testimony conflicts with that of the defendant, who testified only after the government had rested without calling Clifford to testify, I credit Clifford's testimony rather than that of the defendant. Where the defendant's testimony conflicts with that of Campbell, I find Campbell's testimony to be credible. Specifically, the defendant offered the following testimony which conflicted or could be interpreted to conflict with that of Campbell or Clifford: (i) when Campbell found the folding knife in the defendant's pocket, someone said that the defendant was in possession of a concealed weapon; (ii) Campbell asked the defendant if there were any weapons in the apartment and the defendant said there were none; (iii) Campbell said that if the defendant told him where the gun was Campbell would ask the prosecutor to be lenient with him; (iv) after Campbell went into the apartment, Clifford told the defendant that he was looking at 20 to 25 years in jail with his lengthy criminal record; (v) Clifford told the defendant that he was going to be an armed career criminal and that "the feds" would pick up his case; (vi) Clifford told the defendant that he was tired of "the BS," pulled out a cell phone and said that he would call "Darcie," whom the defendant assumed to be the prosecutor, and tell her that the defendant was not being cooperative if the defendant did not tell Clifford where the gun was within the next two minutes; (vii) the defendant was scared because Clifford "threatened" to "throw the book at" him, so he told Clifford where the guns were just as Campbell came out of the apartment; (viii) the defendant was questioned at the Lewiston police station before he signed the *Miranda* waiver form, not after; and (ix) he knew he was under arrest at some point while he was out in the hallway because his probation officer was there and "the officer had me against the wall," even though no
(*continued on next page*)

Clifford identified Government Exhibit 7 as a printout of events involving the defendant as recorded by Lewiston Police Department dispatchers. It shows that the defendant arrived at the police station at 10:29 a.m. He signed the *Miranda* waiver at 10:35 a.m. Government Exh. 2. At 11:25 a.m. the defendant was taken to the Androscoggin County Jail. Government Exh. 7. Government Exhibit 8 is the Androscoggin Sheriff's Department detainee report indicating that the defendant arrived at the jail at 11:53 a.m.

## II. Discussion

No warnings consistent with *Miranda v. Arizona,* 384 U.S. 436, 444 (1966), were given to the defendant until he had been transported to the police station. *Miranda* "forbids coercion" in obtaining incriminating information from a defendant. *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). In order for a defendant's statements to be suppressed because such warnings were not given, the defendant must have been in custody at the time he made the statements and the statements must have been made in response to interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). "The decisive issue in the custody inquiry is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Jones*, 187 F.3d 210, 217-18 (1st Cir. 1999) (citation and internal quotation marks omitted). "For *Miranda* purposes, interrogation is express questioning or its functional equivalent." *United States v. Genao*, 281 F.3d 305, 310 (1st Cir. 2002) (citation and internal quotation marks omitted).

The defendant contends that he was in custody on July 13, 2004 from the moment he "was found in possession of a concealed weapon, a knife," because he believed that he had violated the terms of his probation by carrying the knife and "realized the police had found [him] in violation of Maine State Law." Defendant David Jackson's Motion to Suppress Statements and Physical

---

one said he was under arrest due to his possession of a concealed weapon after Campbell found the knife and he was not handcuffed (*continued on next page*)

6

Evidence, etc. ("Motion") (Docket No. 23) at 7. He also notes that "the now surrounding police let [him] know" that he had been identified as the person who purchased the stolen firearm, along with the other information they had about the gun. *Id*. at 8. Finally, he relies on Campbell's refusal to allow him to leave alone after he offered to try to retrieve the gun. *Id*. at 8-9.

At the conclusion of the hearing, during closing arguments, the government conceded that the defendant was not free to leave when he made the offer to try to retrieve the gun or when he told Campbell that the guns were in the refrigerator, but the defendant takes nothing from this because I conclude that neither statement was the result of interrogation. Informing a suspect of the evidence gained to date by law enforcement in the investigation of a particular crime and of the potential charges against the suspect do not constitute interrogation for purposes of *Miranda*. *See Genao*, 281 F.3d at 308, 310-11 (showing defendant items seized from his apartment and saying "We've got a problem here" not functional equivalent of questioning); *United States v. Conley*, 156 F.3d 78, 81, 83 (1st Cir. 1998) (recital of evidence by officer and his observations on its strength did not constitute interrogation). Campbell testified, credibly, that he only informed the defendant of the evidence he had obtained concerning the stolen gun before the defendant offered to try to retrieve the gun if given one or two hours on his own. None of the other officers called to testify by the defendant remembered Campbell asking the defendant where the gun was or any other particular question.[3] The defendant testified that Campbell asked him to tell Campbell where the gun was before he went into the apartment, but for the reasons discussed *infra* I reject that testimony. There is no evidence of coercion before the defendant made the offer. That statement should not be suppressed.

---

until after the guns were found. None of these factual assertions are mentioned in the defendants' 20-page motion to suppress.

[3] Indeed, only Lacombe testified that any questions were asked of the defendant at all, and he testified that more than one officer asked questions of the defendant but could not say exactly what questions were asked or how they were presented. He also testified that the defendant's statement about the location of the guns was not made in response to any specific question.

With respect to the defendant's later statement that the guns were in the refrigerator, he offers (i) his own testimony to the effect that Clifford "threatened" him while Campbell was in the apartment; (ii) a statement in Officer Lacombe's report that "upon subsequent interview, Jackson admitted that he had received the stolen gun in question from Mancuso the night prior . . . . Jackson advised the he was keeping the gun in a box in the refrigerator in the apartment. Consent was given to search the apartment[,]" Defendant's Exhibit K1; and (iii) Gudas's testimony suggesting that the apartment was searched before Campbell went out into the hallway and informed those present that he had consent to search the apartment. Motion at 10-11 and oral argument. Clifford testified that he did not speak to the defendant while Campbell was inside the apartment. None of the other officers who testified supported the defendant's testimony on this point. I reject the defendant's testimony, offered by an individual with considerable experience with the criminal justice system only after it became clear that Clifford was not going to testify in the government's case-in-chief and not mentioned at all in the defendant's 20-page motion, that Clifford "wanted to know where the gun was," told the defendant that he was "looking at 20 to 25 years" given his criminal record, told the defendant that he was going to be designated an armed career criminal and that federal authorities would pick up the case, and said that he would call "Darcie" and tell her that the defendant was not being cooperative if the defendant did not tell him where the gun was within the next two minutes.

Without the defendant's testimony, he is left with Lacombe's report and the inference drawn from Gudas's testimony. Lacombe testified that he customarily recorded events in his reports in chronological order, but he also testified that he did not recall whether the defendant was asked at any time at 209 Ash Street where the gun was and that when the defendant gave the information about the location of the guns he did not do so in response to any specific question from Campbell. The report, if read strictly in chronological order, states that the defendant "admitted that he had received the

8

stolen gun in question from Mancuso the night prior and he gave Mancuso $100.00 for the gun" before he stated that the guns were in the refrigerator. Defendant's Exhibit K1. No other testimony or evidence so much as suggests that the defendant made any admission about the transaction with Mancuso while he was at 209 Ash Street. So read, the report also records that consent to search the apartment was given only after the defendant said that the guns were in the refrigerator, and again all of the other evidence establishes otherwise: Belanger gave consent before the defendant made the statement. I conclude that the report conflates the interview at the station with the events at 209 Ash Street and otherwise does not record events in accurate chronological order.

  Finally, the argument that the apartment had already been searched before Campbell claims to have stated in the hallway that he had been given permission to search, making it unlikely that he actually made such a statement at that time, or making it likely that his only purpose in making such a statement was to elicit incriminating information from the defendant, is simply insufficient to overcome the credible testimony of the officers involved. Gudas's testimony made clear that her recall of the events of July 13, 2004 was less than stellar. It is entirely possible that the search she remembers took place after Campbell went back into the hallway; she did testify that she did not go back into the hallway before the defendant was arrested and did not hear what Campbell might have said in the hallway. Even if Gudas's chronology is correct, other officers testified that Campbell did make the remark about having consent immediately before the defendant stated that the guns were in the refrigerator, and I credit that testimony. Further, that Campbell intended his statement to elicit incriminating information from the defendant is not the only possible interpretation of that remark under Gudas's chronology.

  The defendant relies in this regard on *Innis*. Motion at 6, 10. In that case, the defendant was arrested after being identified by a cab driver as the man who had just robbed him, brandishing a

9

sawed-off shotgun. 446 U.S. at 293-94. He was given *Miranda* warnings and said that he wanted to speak with a lawyer. *Id*. at 294. While the defendant was being transported to the police station, officers in the vehicle talked about the missing shotgun, saying that there were a lot of handicapped children in the area, one of whom might hurt himself if he found the shotgun and its shells and that it would be too bad if a little girl might pick up the gun and kill herself. *Id*. at 294-95. The defendant then told the officers where the gun was. *Id*. at 295. The Supreme Court held that this was not the functional equivalent of questioning. *Id*. at 302. Campbell's statement that "we have consent to search the apartment" was far less likely to elicit an incriminating response than was the officers' discussion in *Innis*.

To the extent that the defendant also means to argue that either of his statements to Campbell at 209 Ash Street was coerced due to the presence of several law enforcement officers in the hallway and/or by Clifford's threats, I have rejected his testimony that he was threatened and I conclude that a man with his degree of experience with the criminal justice system and the presence of mind to strategically make a false offer to retrieve the gun from a place other than Belanger's apartment was not coerced by the presence of the officers, however many there were. At no time was the defendant's will "overborne in such a way as to render his [statements] a product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991).

Because the defendant's statement about the location of the guns need not be suppressed, the motion to suppress the guns themselves should also be denied. The defendant's motion to suppress the guns is based entirely on the argument that they were found "as a result of the coerced, unprotected[] statements," Motion at 11, a position which I have rejected.

Finally, I reject the defendant's testimony that he signed the *Miranda* waiver at the police station only after the officers had finished questioning him. Government Exhibits 2, 7 and 8 establish

that the defendant signed the waiver shortly after he arrived at the police station and an hour before he left the station. It is not possible that his interview there lasted less than six minutes and it is unlikely that he waited for an hour after the interview concluded before being transported to the county jail. Nor does the small size of the interview room establish that anything the defendant said in that room was coerced; that is the only possible evidence of coercion during that interview that has been offered.

All that being said, the question which Gudas testified she posed to the defendant after he had been arrested and before he had been given a *Miranda* warning, and the defendant's response, should be suppressed. I appreciate the fact that counsel for the government stated at the hearing that Gudas's testimony about this interchange was news to her and that she did not intend to use it at trial, but suppression is required under the circumstances. The defendant's motion should be granted as to that question and answer and only as to that question and answer.

### III. Conclusion

For the foregoing reasons, I recommend that the defendant's motion to suppress be **GRANTED** as to any questions asked of the defendant by Pauline Gudas at 209 Ash Street, Lewiston, Maine on July 13, 2004 after the defendant had been arrested and before he was given *Miranda* warnings and any responses by the defendant to any such questions given at that location on that date and otherwise **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de</u> <u>novo</u> review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de</u> <u>novo</u> review by the district court and to appeal the district court's order.*

*Unless the district judge directs otherwise, the objecting party must promptly arrange for transcribing the record, or portions of it, in accordance with Fed. R. Crim. P. 59(b)(2).*

Dated this 7th day of May, 2007.

                                                /s/ David M. Cohen
                                                David M. Cohen
                                                United States Magistrate Judge