UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) Docket no. 06-cr-94-P-S |
| DAVID JACKSON, | ) |
| | ) |
| Defendant. | ) |

**ORDER ON MOTION TO SUPPRESS**

Before the Court is Defendant's Motion to Suppress Statements and Physical Evidence (Docket # 101). Defendant's Motion follows the First Circuit's decision to remand this case in order for this Court to "consider the admissibility of the statements at the police station in light of [the First Circuit's] holding that the apartment statements are inadmissible." United States v. Jackson, 544 F.3d 351, 361 (1st Cir. 2008). The Court held a hearing on the Motion on February 3, 2009 at which it received some additional testimonial evidence. Now, having considered the entire record in light of the First Circuit's opinion, the Court DENIES the Motion.

**I.  STANDARD OF REVIEW**

The Government bears the burden of proving a defendant's voluntary, knowing and intelligent waiver of his Miranda right by a preponderance of the evidence. See United States v. Palmer, 203 F.3d 55, 60 (1st Cir. 2000); see also Missouri v. Seibert, 542 U.S. 600, 609 n.1 (2004). The issue of voluntariness generally requires the Court to consider "the totality of the circumstances." Palmer, 203 F.3d at 60.

Because this case involves a belated Miranda warning, it is factually analogous to Oregon v. Elstad, 470 U.S. 298 (1985). The First Circuit discussed Elstad at length in deciding the initial appeal of this case:

> [T]here is no automatic rule requiring the exclusion of later statements made after a proper Miranda warning, even though earlier similar statements must be excluded because of a Miranda violation. Oregon v. Elstad, 470 U.S. 298, 314 (1985). An earlier "simple failure to administer the [Miranda] warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will [does not] so taint[ ] the [later] investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." Id. at 309. Thus, "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." Id.; see also United States v. Byram, 145 F.3d 405, 409 (1st Cir. 1998).
>
> In these circumstances, the "finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." Elstad, 470 U.S. at 318.

Jackson, 544 F.3d at 360-61.

## II.   FINDINGS OF FACT[1]

On July 13, 2004, Michael Lacombe, a Lewiston, Maine police officer, responded to a call from Mark Hoener at 188 Russell Street in Lewiston who reported that an RG twenty-two caliber pistol had recently been stolen from that address. Hoener blamed his stepson, Tyler Mancuso. Trevor Campbell, now a detective with the Lewiston Police Department and then a member of the Central Maine Violent Crimes Task Force and cross-deputized as a United States Marshal, joined Lacombe in response to his request for assistance. Campbell spoke to Mancuso, who reported that he had traded the gun for $100 worth of crack cocaine from a black male known as "Scooby" who was wearing dreadlocks and a black do-rag, an orange shirt and gold

---

[1] The Court notes that nothing in the supplemental evidence received contradicts the original factual record. Thus, while the Court's findings include some additional details regarding the police station interrogation, to the extent possible, the Court's factual findings track the findings recited by the First Circuit. See Jackson, 544 F.3d 351, 354-55 (1st Cir. 2008).

chains. Campbell knew that a black man known as Scooby was David Jackson, the defendant in this case, because he had dealt with him previously several times.

Campbell ran a criminal history on Jackson and confirmed that he was on probation following a robbery conviction. Jackson's probation officer, Pauline Gudas, told Campbell that Jackson was currently staying at the apartment residence of Pamela Belanger ("Belanger"), which was located at 209 Ash Street. She also reported that Jackson had a number of previous convictions and that, as a condition of his probation, Jackson was subject to random searches of his residence for weapons or alcohol.

Campbell and his partner, Chris Clifford ("Clifford"), led a group of officers, including Lacombe and Gudas, to Belanger's apartment. In all, at least eight officers went to the apartment. Once the officers arrived on the scene, Campbell knocked on the door, which Belanger answered. Campbell saw Jackson standing several feet behind Belanger. He noticed that Jackson's attire and appearance fit Mancuso's description of the individual who bought the gun.

### A. The Apartment Interrogation

Campbell asked Jackson to step out of the apartment so that he could pat him down for weapons. He then described to Jackson the circumstances concerning the stolen gun and the earlier encounter with Mancuso. He explained to Jackson that he (Jackson) fit Mancuso's description of the buyer, and that he and the other officers were there to locate the stolen firearm. He questioned Jackson as to his "involvement" with the stolen gun. (April 17, 2007 Suppression Hr'g Tr. (Docket # 59) at 1:21-22 p.m.) Attempting to elicit Jackson's cooperation, Campbell pressed Jackson on his involvement with the gun. He did not threaten Jackson, but he hinted that Jackson's cooperation might be met with leniency. Lacombe recalled that the "nature of the

3

conversation" with Jackson was that "[w]e were there looking for a firearm so the conversation was to find this-these firearms that we were looking for." (April 17, 2007 Suppression Hr'g Tr at 3:56 p.m.) At this point, Jackson apparently stated that he might know where the gun was located, and that he could retrieve it if the officers would just give him a few hours. Campbell, not willing to allow Jackson an opportunity to escape or to retrieve a deadly weapon, replied that Jackson was not permitted to leave.

Campbell then went into the apartment hoping to give Jackson some time to consider cooperating and to secure consent to search the premises from Belanger. Belanger provided oral and written consent to search the apartment. Instead of immediately initiating the search, Campbell returned to Jackson and announced that he had secured consent to search the apartment. According to Campbell, he did so with the intention of giving Jackson "a chance to possibly come clean." (April 17, 2007 Suppression Hr'g Tr. at 1:28 p.m.) While it is not clear that any questions were directed at Jackson after this announcement, the record is clear that Jackson then told Campbell that he had lied earlier and informed him that the gun was hidden in a cereal box in the kitchen refrigerator. Campbell then went back into the apartment, searched the refrigerator, and located a box of Fruity Pebbles in which he found two firearms, one of which appeared to be the firearm that had been stolen from Hoener. Jackson was then placed under arrest based on his possession of stolen firearms.

Officer Lacombe, who was in uniform, escorted Jackson in a marked police cruiser to the Lewiston police station. The travel time between 209 Ash Street and the police station was less than 5 minutes. The dispatch report indicates that Jackson arrived at the police station at 10:29 a.m. (Gov't Ex. 7.)

### B. The Police Station Interrogation

Shortly after his arrival at the police station, Jackson was brought to Interview Room # 2, which would have been at least seven feet by seven feet and no larger than ten feet by twelve feet. The interview room had no windows and contained just a table and four chairs.

Campbell arrived at the station and immediately proceeded to the interrogation room. Per his practice, he shut the door to the room. Campbell then administered Jackson his <u>Miranda</u> rights orally and by providing him a written form. (Def. Ex. I.) The form indicates that the <u>Miranda</u> warning was administered at 10:35 a.m. The form also reflects that Jackson said he understood each of the rights explained to him. Both Jackson and Campbell signed the bottom of the form indicating that Jackson was waiving his rights and wished to answer questions.

Campbell then proceeded to ask Jackson questions. Clifford was also present in the interrogation room but asked no questions. Campbell's questions sought additional information from Jackson as to where and how he acquired the firearms found at the apartment. In response to these questions, Jackson admitted that he received the gun from Mancuso but insisted that he obtained the gun for cash, not drugs. He also denied knowing that the gun was stolen.

Both Campbell and Clifford described Jackson's demeanor as calm throughout the interview. There is nothing in the record to suggest that during the course of the interview either the officers or Jackson raised their voices. According to Campbell, he spent a total of ten to fifteen minutes in the interrogation room asking Jackson questions. Jackson was taken to the Androscoggin County Jail by another officer once the interview was completed. The dispatch report indicates that Jackson was taken to the Androscoggin County Jail at 11:25 a.m. and a report from the jail indicates that Jackson arrived at the facility at 11:53 a.m. (Gov't Exs. 7 & 8.)

## III. DISCUSSION

The Defendant's Motion first asks this Court to find that the initial interrogation of Jackson at the apartment was not simply in violation of Miranda but actually coercive or otherwise calculated to undermine Jackson's exercise of his free will. The Court does not believe the record supports such a finding. There is no evidence of threats of violence or serious retaliation by the officers. The record does not establish a prolonged interrogation at the apartment or the use of "question-first tactic[s]" or "a police strategy adapted to undermine the Miranda warnings." Seibert, 542 U.S. at 616-17. In short, the Court finds "none of the earmarks of coercion."[2] Oregon v. Elstad, 470 U.S. 298, 316 (1985). Rather, the current record amply supports the conclusion that Jackson's unwarned statements at the apartment were made voluntarily.[3]

When an unwarned statement is found to be voluntarily made, "a careful and thorough administration of Miranda warnings serves to cure the condition that rendered the unwarned statement inadmissible. The warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.'" Oregon v. Elstad, 470 U.S. 298, 310-311 (1985) (quoting Wong Sun v. United States, 371 U.S. 471, 486 (1963).) In this case, a proper Miranda warning was given, both orally and in writing, before any questioning was done at the police station. Although Defendant now argues that the questioning at the police station was a continuation of the

---

[2] To the extent that the number of officers, eight in total, might arguably create a coercive environment given the size of the apartment, the Court does not believe that the number of officers alone supports a finding of coercion. In this case, the number of officers at the apartment reflected the danger inherent in searching for stolen firearms and the fact that Jackson was on probation and subject to searches of his home as a result.

[3] To the extent that Defendant continues to argue that there was coercion in any hints of leniency combined with an orchestrated call to the prosecutor, the Court notes that its factual findings do not support this argument. In addition, "trickery is not automatically coercion" and the First Circuit has declined to find "a false assurance to a suspect that he was not in danger of prosecution" as amounting to coercion. United States v. Byram, 145 F.3d 405, 408 (1st Cir. 1998).

6

apartment questioning, this is not a case in which "Miranda warnings [were] inserted in the midst of coordinated and continuing interrogation." Seibert, 542 U.S. 613. In this case, there was a short but significant break in the questioning that coincided with an equally significant change in location to the police station interrogation room. Under these circumstances, the mere fact that the topic of the questioning was the same does not invalidate the significance of the properly-administered Miranda warning. In short, the Court finds that Jackson had the information and opportunity to invoke his right to remain silent and refuse to answer questions. His decision to waive that right at the police station was knowing, intelligent and voluntary.

Finally, the Court turns its attention to Defendant's renewed request that the Court suppress the firearms found as a result of his unwarned apartment statements. At the hearing, Defendant's counsel appeared to acknowledge that such a suppression of physical evidence would require a finding by this Court that the apartment statements were, in fact, coerced. The Court has declined to make such a finding. As a result, the Supreme Court's decision in United States v. Patane, 542 U.S. 630 (2004), clearly controls. The Court declines to suppress the physical fruits of a simple Miranda violation. See Patane, 542 U.S. at 634 ("[T]he Miranda rule protects against violations of the Self-Incrimination Clause, which, in turn, is not implicated by the introduction at trial of physical evidence resulting from voluntary statements."); see also Jackson, 544 F.3d at 361 (citing Patane).

**IV.    CONCLUSION**

For the reasons explained herein, Defendant's Motion to Suppress Statements and Physical Evidence (Docket # 101) is hereby DENIED.

SO ORDERED.

　/s/ George Z. Singal　　　　　　
　Chief U.S. District Judge

Dated this 3rd day of February, 2009.